Eric Nielson #5327
Laura Nielson #15008
G. ERIC NIELSON & ASSOCIATES
4790 S. Holladay Blvd.
Holladay, Utah 84117
Phone: (801) 424-9088
Fax:   (801) 438-0199
ericnielson@ericnielson.com
lauranielson@ericnielson.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT,
DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| CHRISTOPHER S., DIANA S., and T.S.<br><br>Plaintiffs,<br><br>vs.<br><br>SHERWIN WILLIAMS and THE SHERWIN-WILLIAMS COMPANY RETIREE MEDICAL PLAN,<br><br>Defendants. | **COMPLAINT**<br><br>Case No. 1:24-cv-00196-CMR<br><br>Magistrate Judge Cecilia M. Romero |

**COME NOW** Christopher S., Diana S, and T.S., individually, and through their undersigned counsel, complain and allege against the above-captioned defendants as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Christopher S. ("Chris") and Diana S. ("Diana") are natural persons residing in Davis County, Utah. They are covered by a self-funded plan, the Sherwin-Williams Company Retiree Medical Plan ("the Plan"), provided through Chris' employer, Sherwin Williams.

2. Plaintiff T.S. is a resident of Davis County, Utah. As a beneficiary of his father, Chris', health insurance plan, he received treatment at Triumph Youth Services ("Triumph"), a

1

licensed residential treatment facility in Brigham City, Utah from October 20, 2020, through January 20, 2021.

3. The Plan is an employee benefit plan governed by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et. seq.

4. This Court has jurisdiction over this matter and venue is appropriate pursuant to 29 U.S.C. §1132(e)(2) and 29 U.S.C. § 1391(c) because the appeals were written by a company located in Salt Lake City, Utah.

5. Plaintiffs seek payment of T.S.' denied claims from November 30, 2021, through April 20, 2021, for treatment rendered at Triumph, pursuant to 29 U.S.C. §1132(a)(1)(B).

6. Plaintiffs seek injunctive relief pursuant to 29 U.S.C. §1132(a)(3) and pursuant to the Mental Health Parity and Addiction Equity Act of 2008 ("the Parity Act").

7. Plaintiffs also seek an award of prejudgment interest and attorney's fees pursuant to 29 U.S.C. §1132(g).

## FACTUAL BACKGROUND

8. T.S. experienced symptoms of behavioral issues since he was a child such as being extremely intolerant of any discomfort and lack of interest in normal child activities.

9. T.S. was diagnosed with attention-deficit/hyperactivity disorder ("ADHD") in fifth grade.

10. T.S. struggled with maintaining friendships and would be devastated if the friendships he made ended.

11. T.S. was introduced to and began consuming marijuana in seventh grade.

12. T.S. would secretly use his parents' credit card to buy things for his new friends.

13. When reprimanded for inappropriate behavior and marijuana use, and restricted from access to it, T.S. began using DXM from cough syrup and would shoplift.

14. T.S. began displaying symptoms of depression and would state that he did not want to live.

15. T.S.'s family took him to a therapist but struggled with T.S., often fighting against it.

16. In early 2019, T.S. obtained muscle relaxants from his friends and overdosed, resulting in him being taken to Davis Hospital.

17. The same week after being released from the hospital, T.S. was caught using DXM and his family was forced to take him back to the hospital, where he was determined to need admission to Huntsman Mental Health Institute.

18. T.S. was diagnosed with depression, anxiety, and substance use disorder.

19. T.S. attended TeenScope, a day treatment program, from February 2019 to March 2019, which he also often fought against and was ultimately expelled from due to his extreme behavioral problems.

20. T.S. would water down his drug tests, snorted his ADHD medication, and ran away for three days.

21. The police were involved in eight separate incidents with T.S. for elopement, suspicious activity, lewd and disorderly conduct, criminal mischief and trespassing, harassment, and a threat of suicide.

22. T.S. was recommended to be admitted into Provo Canyon school and was admitted for five weeks. However, his experience only exacerbated his problems. He experienced trauma from attacks by other students and isolation.

23. Two days after T.S.' release from Provo Canyon School, he consumed Benadryl to the point of causing hallucinations.

24. T.S. later was expelled from High School only ten days into the school year for Air Dropping a video of someone committing suicide from his phone while he was high.

25. T.S. was also charged for vandalism for spraying a fire extinguisher in a church.

26. T.S. was admitted into another treatment program and was doing well until it closed due to Covid-19.

27. T.S. returned to high school but continued his marijuana use and would rarely attend class and failed to respond to twenty-five clinical meetings with the school social worker. T.S. stated he felt no obligation to attend school after realizing his family could not physically force him to attend.

28. In one instance, T.S. took Xanax, smoked marijuana, drank alcohol and threw a rock into the window of a convenience store and smashed his phone. The next day, he did not remember anything that had happened.

29. T.S.'s relationship with his brother became strained and at one point was told he was not loved by his brother, which prompted T.S. to cut his arm so deeply with a knife that the cuts required stitches.

30. T.S.' substance use continued, he would steal Xanax from his friend's grandmother, steal alcohol, and would often consume multiple substances at the same time.

31. T.S. was admitted to Highland Ridge Hospital and another day treatment program Odyssey House Day treatment program, where he once again, refused to go most days and consistently failed every drug test.

32. T.S. spent his days seeking drugs, repeatedly stating he hated life and didn't want to live and continued this behavior despite his family's every attempt to interfere and no matter how many privileges they took away from him.

33. T.S. was found ingesting Xanax and alcohol again and was brough home by his friend's grandmother and taken to the hospital.

34. T.S. was then transported to Triumph for intensive, long-term treatment.

**PRE-LITIGATION APPEAL PROCESS FOR T.S.' TREATMENT AT TRIUMPH**

35. Claims were submitted to the Plan for T.S.' treatment at Triumph.

36. Anthem, the claims administrator for the Plan, sent a letter dated December 02, 2021, denying T.S.' treatment at Triumph. The denial letter stated, in part (emphasis in original):

> **This isn't the news you want to hear, but we can't approve your request.** Here's why. The review showed that what you've requested is Not Medically Necessary. Your plan doesn't cover that kind of care.
> …
> **Details from the Clinical Review**
> The request tells us you went to a residential treatment center for your mental health condition. The program asked to extend your stay. The plan clinical criteria consider ongoing residential treatment medically necessary for those who are a danger to themselves or others (as shown by hearing voices telling them to harm themselves or others or persistent thoughts of harm that cannot be managed at a lower level of care). This service can also be medically necessary for those who have a mental health condition that is causing serious problems with functioning. (For example, being impulsive or abusive, very poor self-care, not sleeping or eating, avoidance of personal interactions, or unable to perform usual obligations). In addition, the person must be willing to stay and participate, and is expected to either improve with this care, or to keep from getting worse. The information we have does not show you are a danger to yourself or others or that you are having serious problems functioning. You have no serious medical problems, and your condition is not likely to get worse without it. For this reason, the request is denied as not medically necessary. There may be other treatment options to help you, such as outpatient services. You may want to discuss these with your doctor. It may help your doctor to know we reviewed the request using the MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-RES).

37. On May 10, 2022, the family submitted a Level One Member Appeal.

38. In the appeal, Plaintiffs outlined that they disagreed with Anthem's rationale that the treatment not medically necessary.

39. Plaintiffs further outlined their rights and expectations for a full, fair, and thorough review under ERISA regulations.

40. The Plaintiffs provided T.S.' medical history, medical records and letters of medical necessity from his treating professionals confirming the appropriateness of treatment received at Triumph.

41. Plaintiffs emphasized specific treatment notes from T.S.' stay at Triumph that demonstrated that the treatment was medically necessary to treat T.S.' complex behavioral health conditions including Major depressive disorder, generalized anxiety disorder, Alcohol Use Disorder, Cannabis Use Disorder, Other Substance Use Disorder, and ADHD.

42. Furthermore, the Plaintiffs argued that Anthem incorrectly applied the MCG Criteria and expressed concerns that Anthem was placing treatment limitation more restrictive than those placed on medical or surgical benefits, violating the Mental Health Parity and Additional Equity Act of 2008.

43. Plaintiffs received another Denial letter dated August 10, 2022, in which treatment was once again denied.

44. In a letter dated August 19, 2022, Anthem responded to Plaintiffs' appeal and upheld their denial of T.S.' treatment at Triumph. The denial letter stated, in part (emphasis in original):

> **Our decision**
>
> We have re-reviewed your specific circumstances and health condition as documented in the appeal and clinical information provided to us by your

treating physician. The reviewer is a health plan Medical Director, and MD who is board certified and specializes in Psychiatry. It's their recommendation that we keep our previous coverage decision. Here's why:

We reviewed all the information that was given to us before with the first request for coverage. We also reviewed all that was given to us for the appeal. Your doctor wanted you to stay longer in residential treatment center care. You were getting this because you had been at risk of serious harm without 24-hour care. We understand that you would like us to change our first decision. Now we have new information from part of the medical record plus letters and other documents. We still do not think this was medically necessary for you. We believe our first decision is correct for the following reason: after the treatment you had, you were no longer at risk for serious harm that needed 24-hour care. You could have been treated with outpatient services. We based this decision on the MCG guideline Residential Behavioral Health Level of Care, Child or Adolescent (ORG: B-902-RES).

The treatment was considered not medically necessary. Services that are not medically necessary are excluded from coverage. The definition of medically necessary is escribed in Definition section, located on page 78, of your The Sherwin-Williams Company Benefit Booklet.

45. Anthem sent Plaintiffs an additional amended denial letter dated September 16, 2022, in which the denial was upheld. The letter's decision rationale was the same, but the letter stated, in part (emphasis in original):

**AMENDED:** Triumph Youth Services LLC is Non-Par

46. Plaintiffs submitted an Independent Review Organization Request on December 30, 2022.

47. The Plaintiffs outlined the requirements listed for independent review under the Uniform Health Carrier External Review Model Act, and requested the review comply with all requirements.

48. Plaintiffs further argued that Anthem was misapplying the MCG Criteria.

49. Plaintiffs emphasized that according to the MCG Criteria, T.S. had not met discharge requirements and had to be constantly observed for his safety and to prevent him from putting himself in harm's way.

50. In a letter dated February 14, 20223, the IRO decision upheld Anthem's denial. The determination letter, stated, in part (bold emphasis in original):

> **Records reviewed:**
> Health plan determination letters
> Appeal letters from patient's family
> Utilization management notes
> Submitted clinical documentation
> Health plan benefit document
>
> **Review questions:**
> **1. Is the proposed treatment medically necessary (can provision of the treatment, in whole or in part, reasonably be expected to be health beneficial for the patient and/or can withholding the treatment, reasonably be expected to affect the patient's health adversely)?**
>
> No, the proposed treatment was not medically necessary.
>
> For the dates of service in question, there is no documentation of danger to self or others as indicated by the patient's denial of suicidal ideation, self-injurious behavior, or urges to self harm. There is no documentation of serious psychiatric, behavioral, or comorbid medical conditions requiring 24-hour per day monitoring or treatment. Residential level of care is reserved for these symptoms. Review of the medical literature indicates that multi-systemic family therapy is comparably effective for patients with co-occurring substance use and mental health disorders with regards to substance use, delinquency, and mental health symptoms. This treatment can be provided at significantly lower levels of care than residential. As such, the residential level of care was not medically necessary for the patient for dates of service 11/30/2021 to 04/20/2022.
>
> **2. Should the health plan cover the proposed treatment?**
>
> No, the health plan should not cover the proposed treatment.
>
> The residential level of care for dates of service 11/20/2021 to 04/20/2021 was not medically necessary according to the medical literature or the patient's health plan, and as such should not be covered.
>
> **3. Has sufficient information been provided to render an opinion?**

Yes, sufficient information has been provided to render an opinion.

**4. Is the proposed treatment medically necessary according to the patient's health insurance certificate?**

No, the proposed treatment was not medically necessary according to the patient's health insurance certificate.

51. The family exhausted their appeal rights with Anthem.

## FIRST CAUSE OF ACTION

**(Claim for Benefits Under 29 U.S.C. §1132(a)(1)(B)), Claim for Equitable Relief Pursuant to 29 U.S.C. §1132(a), and Claim for Breach of Fiduciary Duty Pursuant to 29 U.S.C. §1132(a)(3))**

52. ERISA imposes higher-than-marketplace standards on the Plan and other ERISA fiduciaries. It sets forth a special standard of care upon a plan fiduciary, namely that the administrator discharges all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits. 29 U.S.C. §1104(a)(1).

53. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that plan administrators provide a "full and fair review" of claim denials. 29 U.S.C. §1104(a)(1)(D) and §1133(2).

54. The Plan's actions or failures to act constitute a breach of its fiduciary duties to the family under 29 U.S.C. §1104 and §1133 in the following ways: 1) by failing to set forth the specific reasons for T.S.' claim denial, written in a manner calculated to be understood by the family; 2) by failing to provide a "full and fair review," as anticipated in ERISA's claims processing regulations, of the denial of the T.S.' claim; 3) by developing and relying upon internal practices and policies that improperly restricted coverage in contravention of Plaintiffs' health insurance plans, ERISA, and the Parity Act; and 4) by failing to discharge all plan duties solely in

9

the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits.

## SECOND CAUSE OF ACTION

### (Claim for Violation of the Parity Act Under 29 U.S.C. §1132(a)(3))

55. The Parity Act is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and the Parity Act.

56. The Parity Act requires that if a group health plan provides both medical and surgical benefits as well as mental health or substance use disorder benefits, then it may not apply any "treatment limitation to mental health or substance use disorder benefits in any classification that is more restrictive than the predominant ... treatment limitation of that type applied to substantially all medical/surgical benefits in the same classification." 29 C.F.R. § 2590.712(c)(2)(i) (amended Jan. 13, 2014); *see also* IFRs Under the Parity Act, 75 Fed. Reg. at 5413.

57. The Parity Act also requires that if a plan "provides mental health or substance use disorder benefits in any classification of benefits..., mental health or substance use disorder benefits must be provided in every classification in which medical/surgical benefits are provided." 29 C.F.R. § 2590.712(c)(2)(ii).

58. Impermissible nonquantitative treatment limitations under the Parity Act include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A) and (H).

59. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan restricted for T.S.' treatment include sub-acute inpatient treatment settings

such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does the Plan restrict coverage of medical/surgical conditions based on medical necessity, geographic location, facility type, provider specialty, or other criteria in the manner the Plan restricted coverage of treatment for T.S. at Triumph.

60. Specifically, the Plan's reviewers utilized internal processes and procedures that may have placed a limitation on the scope of services available for intermediate behavioral health care, while not limiting the scope of services available for intermediate medical or surgical benefits.

61. When the Plan receives claims for intermediate-level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice. The Plan evaluated T.S.' mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

62. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

63. The violations of the Parity Act by the Plan give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

64. A declaration that the actions of the Defendants violate the Parity Act;

65. An injunction ordering the Defendants to cease violating the Parity Act and requiring compliance with the statute;

66. An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with the Parity Act;

67. An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of the Parity Act;

68. An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of the Parity Act;

69. An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

70. An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of the Parity Act; and

71. An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of the Parity Act.

72. 45. In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A.

73. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

**RELIEF**

74. WHEREFORE, the Plaintiffs seek relief as follows:

75. Judgment in the total amount that is owed for T.S.' medically necessary treatment at New Vision and CALO under the terms of the Plan, plus pre- and post-judgment interest to the date of payment;

76. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

77. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

78. For such further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED this 29th day of November, 2024.

              G. ERIC NIELSON & ASSOCIATES

               /s/ Laura Nielson
              Laura Nielson
              *Attorney for Plaintiffs*